[Cite as *State v. Mack*, 2014-Ohio-4552.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J. |
| | Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 13 CAA 11 0080 |
| MARK E. MACK | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:      Appeal from the Delaware County Court of Common Pleas, Case No. 13 CRI 030102


JUDGMENT:      Affirmed


DATE OF JUDGMENT ENTRY:      October 13, 2014


APPEARANCES:


For Plaintiff-Appellee      For Defendant-Appellant


CAROL HAMILTON O'BRIEN      MICHAEL A. MARROCCO
DOUGLAS N. DUMOLT      98 North Union Street
Delaware County Prosecutors Office      Delaware, Ohio 43015
140 North Sandusky Street, 3rd Floor
Delaware, Ohio 43015

*Hoffman, P.J.*

{¶1}   Defendant-appellant Mark Mack appeals his conviction entered by the Delaware County Court of Common Pleas.  Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   Appellant, along with co-defendants Pamela Webb and Tarra Wright, is alleged to have stolen credit/debit cards from various individuals, and to have immediately made unauthorized purchases and cash advances on the stolen cards. The victims, all women, positioned their purses on the back of their chairs or nearby while eating at restaurants in highly frequented shopping areas.

{¶3}   Appellant was indicted on one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1); twenty counts of identity theft, in violation of R.C. 2913.49(B)(1); ten counts of receiving stolen property, in violation of R.C. 2913.51(A); a single count of theft, in violation of R.C. 2913.02(A)(3); and one count of possession of criminal tools, in violation of R.C. 2923.24(A).

{¶4}   Following a jury trial, Appellant was found guilty of all but counts nine, ten and eleven.

{¶5}   Appellant appeals, assigning as error:

{¶6}   "I. THE JURY'S GUILTY VERDICT AND THE TRIAL COURT'S ENTERING A JUDGMENT OF CONVICTION AGAINST DEFENDANT/APPELLANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUPPORT HIS CONVICTION WAS IN ERROR.

{¶7} "II. THE JURY'S GUILTY VERDICT AND THE TRIAL COURT'S ENTERING A JUDGMENT OF CONVICTION AGAINST DEFENDANT/APPELLANT WHEN THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WAS IN ERROR."

I. and II.

{¶8} Appellant's assigned errors raise common and interrelated issues; Therefore, we will address the arguments together.

{¶9} Appellant maintains the testimony linking Appellant to the crimes for which he was convicted was not credible and was elicited from a convicted liar. Accordingly, Appellant asserts the jury clearly lost its way in convicting Appellant of the crimes. Specifically, Appellant argues the State's case against Appellant relies on the testimony of convicted felon, Pamela Webb.

{¶10} Initially, we note, as an appellate court, our role is not to judge the credibility of the evidence; rather, to determine whether the evidence, if believed, would support a conviction. The evidence is to be viewed in a light most favorable to the prosecution. When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997) (stating that "sufficiency is a test of adequacy"); *State v. Jenks,* 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991). The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a

reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Jenks,* 61 Ohio St.3d at 273, 574 N.E.2d 492. Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins,* 78 Ohio St.3d at 390, 678 N.E.2d 541 (Cook, J., concurring).

{¶11} Thus, when reviewing a sufficiency-of-the-evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *State v. Hill,* 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts,* 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh,* 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶12} When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider witness credibility. A reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *E.g., State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. DeHass,* 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Once the reviewing court finishes its examination, the court may reverse the conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶13}** If the prosecution presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *State v. Eley,* 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus. Generally, a reviewing court should find a conviction against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the conviction.'" Tompkins 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717; *accord State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

**{¶14}** In this case, Appellant was convicted of identity theft, in violation of R.C. 2913.49(B) (1), which reads,

**{¶15}** "(B) No person, without the express or implied consent of the other person, shall use, obtain, or possess any personal identifying information of another person with intent to do either of the following:

**{¶16}** "(1) Hold the person out to be the other person;

**{¶17}** "(2) Represent the other person's personal identifying information as the person's own personal identifying information."

**{¶18}** Appellant was also convicted of receiving stolen property, in violation of R.C. 2913.51(A), which reads,

**{¶19}** "(A) No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."

**{¶20}** Further, Appellant was convicted of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A) (1), which reads,

**{¶21}** "(A) (1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."

**{¶22}** At trial herein, the trial court instructed the jury as to "complicity" and "aiding and abetting,"

**{¶23}** "The Defendant is charged in Count 1 through 33, no Count 11, as a principal offender.  Under the laws of Ohio, the State may charge as a principal any individual who may be complicit in the commission of an offense.

**{¶24}** "A person is complicit if acting in the same culpability required for the offense he does any of the following; solicits or procures another to commit the offense; aids or abets another in committing the offense.

**{¶25}** "'Aids' means to help assist or assist or strengthen.

**{¶26}** "'Abets' means to encourage, counsel, incite, or assist, or conspire with another to commit the offense or causes an innocent or irresponsible person to commit the offense.

**{¶27}** "'Knowingly', and 'purposely' will be defined for you."

**{¶28}** Tr. at 1026-1027.

**{¶29}** R.C. § 2923.03 defines complicity as,

**{¶30}** "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

**{¶31}** "(1) Solicit or procure another to commit the offense;

**{¶32}** "(2) Aid or abet another in committing the offense;

**{¶33}** "(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

**{¶34}** "(4) Cause an innocent or irresponsible person to commit the offense.

**{¶35}** "***

**{¶36}** "(F) Whoever violates this section is guilty of complicity in the commission of an offense, *and shall be prosecuted and punished as if he were a principal offender*. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." (Emphasis added.)

*Count 1 Engaging in a Pattern of Corrupt Activity*

**{¶37}** Appellant was convicted in Count 1 of engaging in a pattern of corrupt activity, with a forfeiture specification of utilizing a computer. At trial, Patricia Webb testified she and Appellant, along with Appellant's girlfriend Tarra Wright, would drive to Columbus to engage in a criminal operation involving the theft of credit cards from shoppers in various shopping destinations. Specifically, she testified,

**{¶38}** "A. Well, we start - - we come down, we find us somewhere to stay. If it was by night - - if it was nighttime, of course, we had to wait until lunchtime or what have you.

**{¶39}** "Once we found somewhere to stay, we could go out - - get dressed and go out and started, you know, going to the restaurants or whatever and pickpocketing people and started going in the banks.

{¶40} "We'd go early so we can get into the banks.  And if not, we would - - if we didn't do too well in the banks or whatever, we would go to like Best Buys and stuff like that for electronics.

{¶41} "Q. Did you guys go to the Dublin Tuttle area at some points to use the cards?

{¶42} "A. Dublin?

{¶43} "Q. Dublin, yes.

{¶44} "A. Yes.

{¶45} "Q. And did you go to the Polaris sometimes to use the cards?

{¶46} "A. Yes.

{¶47} "Q. And how 'bout the Easton area?

{¶48} "A. Yes.

{¶49} "Q. When the three of you guys were here, if you would go to a bank how would - - you guys go to the bank with a card that someone had taken, how would that transaction then work?

{¶50} "A. He would print out the - - make up the license to go with the credit card, and we would go in the bank, either Tarra or I would go in the bank.

{¶51} "* * *

{¶52} "Q. And you mentioned I.'D.s that were - - you said he printed up.  Who printed up I.D.s?

{¶53} "A. Mark.

{¶54} "Q. And why did you need I.D.s at the bank?

{¶55} "A. Because we needed the I.D.s to get the cash advance off the credit cards.

{¶56} "Q. And what type of I.D.s would he print you up?

{¶57} "A. We wouldn't print up - - it would be out-of-state I.D.s.

{¶58} "Q. So if you're in Ohio would you use Ohio driver's license?

{¶59} "A. No.  No.

{¶60} "Q. Can you tell us a little bit about when you guys would go out, then, you said around lunchtime you would start?

{¶61} "A. (Nods head.)

{¶62} "Q. How would you choose which locations to go to?

{¶63} "A. By the seats or what have you.  It would have to mainly be chairs because if it was booths, we couldn't get to the purses or whatever.  So it had to be chairs or something to that nature.

{¶64} "Q. So what type of restaurants would you guys hit that had chairs?

{¶65} "A. Like the delis, like Jason Deli, Panera Bread and things like that nature where they had a lot of chairs or what have you.

{¶66} "Q. Okay.  And so why lunchtime?

{¶67} "A. Lunchtime, because that's when the majority of the people would be out, working people would be out during lunchtime.  It's like - - And it would be crowded so it wouldn't be so obvious.

{¶68} "Q. And when you guys would go, then, where were the - - where would purses be located that you would try to target first?

{¶69} "A. On the back of chairs.

**{¶70}** "Q. Anywhere else that you looked for as well.

**{¶71}** "A. On the floor.

**{¶72}** "Q. Does it matter if they're zipped or unzipped?

**{¶73}** "A. No.

**{¶74}** "Q. Did it matter if the purses were by people's feet or - -

**{¶75}** "A. No.

**{¶76}** "Q. - - on the side of them?

**{¶77}** "A. No, not at all.

**{¶78}** "Q. Did you - - have you, during this time, been one who actually pickpockets the wallet out yourself?

**{¶79}** "A. Not at - - not out of state.  I would do it in Illinois.  I had done it in Illinois before.

**{¶80}** "Q. Who would do it when you - - Mr. Mack and Tarra came down to Columbus?

**{¶81}** "A. Mark.

**{¶82}** "Q. And why was that?

**{¶83}** "A.That was just how we did it.  I mean, it wasn't no particular thing.  I mean, we didn't - - if he - - I mean, if I did it, why would we need him?

**{¶84}** "Q. The times that the wallets were taken, were you guys able to ever take credit cards without actually taking the wallet itself with you?

**{¶85}** "A. Yeah, sometimes he would take the wallet and take the credit cards out and put the wallet back.

**{¶86}** "Q. Why would he do that?

**{¶87}** "A. So it wouldn't be so obvious.  When she look in her purse the wallet would still be there but we would have the credit cards.

**{¶88}** "Q. And so after Mr. Mack got the wallets in these cases, what happened? What did you - - what did you guys do?

**{¶89}** "A. We would wait on him to print up the I.D.

**{¶90}** "Q. And where would he do that?

**{¶91}** "A. In the van.

**{¶92}** "Q. Had he always done it in the van?

**{¶93}** "A. Most of the time, yeah.

**{¶94}** "Q. And before he had the - - the van that you guys came down in, did you see where he would do it occasionally?

**{¶95}** "A. In the car.  I only came with him one time in a car.  But it was hard in the car because you can see, you know, people could see walking by.

**{¶96}** "Q. And so did you ever try to do it in any other location, other than a car or a vehicle?

**{¶97}** "A. No.  Oh, oh, yeah, we used to do it back at the hotel.  We used to - - when we first started coming we would leave the stuff at the hotel and go all the way back to the hotel.

**{¶98}** "But the credit cards started dying out before we get a chance to use 'em, so that's - - I suggested that we take it in the car with us.

**{¶99}** "Q. And so you said that the credit cards started dying out?

**{¶100}** "A. Yeah.

**{¶101}** "Q. What do you mean by that?

{¶102}  "A. They would cancel their credit cards before we get to use 'em.

{¶103}  "Q. And so that's when you had the idea, you said, of why don't we do it on the road?

{¶104}  "A. Yeah, take the machine with us or whatever.

{¶105}  "* * *

{¶106}  "Q. Now, going back to the printer for a moment, you had indicated that Mr. Mack used them to make out-of-state driver's license when he was in Ohio; is that correct?

{¶107}  "A. Correct.

{¶108}  "Q. Once you got the license from him, was there any type of priority of what types of things you would use the credit cards for and the I.D.s for first?

{¶109}  "A. Yeah, we would try to go to the bank first because that was during the lunch hour or whatever.

{¶110}  "Q. So when you go to the bank, why do you try to go to the bank first?

{¶111}  "A. Because the bank's close at a certain time.

{¶112}  "Q. Okay.  And what do you get from the banks with credit cards and then the cash?

{¶113}  "A. Cash advances, so…

{¶114}  "Q. So you said that's the first priority.  What - - what would you guys look for, then, after you tried cash advances?

{¶115}  "A. Electronics.

{¶116}  "Q. What types of electronics would you guys try to get?

{¶117}  "A. Computers and cameras and stuff like that.

**{¶118}**  "Q. And what types of computers would you try to get usually?

**{¶119}**  "A. We would try for the Apple Computer, the Notebook or the Notepad or whatever.

**{¶120}**  "Q. And cameras, are you buying these - - buying cheap cameras or are you buying expensive cameras or what are you looking for?

**{¶121}**  "A. No, we tried to buy the most expensive one because that would give us the most money.

**{¶122}**  "Q. And these, the cameras you mentioned, laptops you mentioned, why these types of items?

**{¶123}**  "A. Because they're smaller.

**{¶124}**  "Q. Why's that important?

**{¶125}**  "A. The more we could fit into the van or what have you.

**{¶126}**  "Q. And once you - - describe how you'd go into the store, then, and use one of these cards to get, let's say, electronics, use a credit card and an I.D., describe how you would do that.

**{¶127}**  "A. We would go into the store and ask 'em for the computer or the camera, whatever was available.  Whatever was faster, that's how I would do it, whatever was faster to get in and out of the store.  'Cause the less time you're in there, the less time they notice you, whatever; they don't get a chance to see your face so you can go back into that store.  That's how I would do it.

**{¶128}**  "Q.  And would the people there try to upsell you on warranties and - -

**{¶129}**  "A. Yes.

**{¶130}**  "Q. - - extended services, things like that?

**{¶131}** "A. Yes.

**{¶132}** "Q. And what do you do when they tried to do that?

**{¶133}** "A. A lot of times I would - - I would fill out the warranty papers but I wouldn't buy the warranty papers because it's a waste of money because we're not gonna keep the computers.

**{¶134}** "And I would say that I would come back and purchase the warranty later but knowing that I wouldn't because we would sell it.

**{¶135}** "Q. And when that was going on, why didn't you just say, no, I don't want the warranty; no, I don't want to fill out the paperwork or anything?

**{¶136}** "A. To keep the suspicion down.

**{¶137}** "Q. When you went back out, did you take the items back out to the van, then?

**{¶138}** "A. Yes.

**{¶139}** "Q. And after you went and got done with the electronics, were you - - were you able to sell those yourself?

**{¶140}** "A. No, we would - - we would taken 'em back and sell 'em to the - - to the people in Chicago or what have you.

**{¶141}** "Q. And did you have the contacts to where you were able to do that yourself?

**{¶142}** "A. I've - - I've known 'em, yeah.  I have too [sic], yes.

**{¶143}** "Q. And so you sold some of the items.  Did anyone else sell any of the items?

**{¶144}** "A. We all went together.

**{¶145}** "Q. Okay.

**{¶146}** "A. We all went together to sell 'em most times.

**{¶147}** "Q. And why would you guys go together?

**{¶148}** "A. I wanted my money just like everybody else. We would split it three ways or how many people participated in it.

**{¶149}** "Q. And so if you didn't go, how do you know if you're gonna get your money? If you didn't go to fence the stuff, how do you know if you're gonna get your money?

**{¶150}** "A. They was pretty good about giving me my money. I didn't - - trusted 'em.

**{¶151}** "Q. And when you're saying, 'them,' who are you referring to?

**{¶152}** "A. Mark and Tarra 'cause they was a couple. So they mostly kept the items or what have you if we couldn't get in touch with nobody by the time, you know, we got back or whatever, it was too late. Or sometimes they would have to keep 'em overnight. But they always gave me my money."

**{¶153}** Tr. at p. 680-698.

**{¶154}** Based upon the testimony of Ms. Webb, this Court's analysis and disposition of Appellant's remaining assigned errors presented supra, and the cumulative evidence presented at trial herein, Appellant's conviction for engaging in a pattern of corrupt activity is affirmed.

*Counts 2-31 Identify Theft and Receiving Stolen Property*

*Counts 2 and 3 Patricia Mayer*

**{¶155}** Appellant was convicted in Counts 2 and 3 of identity theft and receiving stolen property relative to Patricia Mayer. Appellant maintains the only evidence linking Appellant to the charges is the testimony of his co-defendant Patricia Webb. Patricia Mayer testified she made a purchase at a running store and proceeded to lunch on the date in question at a TGI Fridays. She testified she placed her purse "on the floor" at the restaurant. Tr. at p. 137-139. She discovered at lunch her wallet was missing. She returned to the running store, but did not find her wallet. She then filed a police report. Tr. at p. 139-140. She did not give Appellant or Webb permission to use her credit cards. Tr. at 141. The State presented a still photograph of Webb using Ms. Mayer's credit card to make a $2,500 cash withdraw on August 3, 2010. The same date her credit card was used without her permission at Best Buy for $1,988 in unauthorized purchases.

*Counts 4, 5 and 6 Mary Farley*

**{¶156}** Mary Farley testified on August 4, 2010, she was having lunch at Pot Belly's at Easton Shopping Center. Tr. at 180-188. She placed her purse on the back of her chair. Later in the day, she received a call from a credit card company inquiring as to recent purchases on her account. At which point, she noticed she did not have her wallet. She called the police, and her banking companies. She learned of charges to Best Buy in the amount of $2,500, $1,700 at Walmart, CVS charges, and other charges. She testified she had not given anyone permission to use her cards.

{¶157} The State presented still photographs of Webb making $3,000 in cash advances on Ms. Farley's stolen credit card.  Approximately 38 minutes later, Appellant and Webb were photographed in Walmart purchasing approximately $1,700 in merchandise and gift cards.

*Counts 7 and 8 Patricia O'Neil*

{¶158} Patricia O'Neil testified on August 11, 2010, she had lunch at Panera Bread in Dublin.  She paid for her food with her credit card, put her card in her wallet, and put her purse on the back of her chair. Tr. at 234. She testified her mother had gotten a call from a credit card company about a recent transaction.  Tr. at 235. She and her husband called the credit card companies and realized unauthorized charges were on the cards.  The charges included a charge at Best Buy, at Target, a couple at Shell Gas, and a few bank cash advances. The transactions totaled near $8,000. She testified Appellant and his co-defendants did not have permission to use her cards. Tr. at 239.

{¶159} Video still images show Pamela Webb obtaining a $2,800 cash advance on August 11, 2010 from PNC Bank. The card was also used at U.S. Bank and Target.

*Counts 12 and 13 Constance Maze*

{¶160} Constance Maze testified on August 27, 2010, she had lunch at TGI Fridays at Polaris Parkway. She hung her purse on the back of her chair. When she went to pay her bill, her wallet was missing from her purse. She checked her bank online, and found no money in her accounts and pending charges at CVS. Tr. at 395. She had not authorized Appellant or his codefendants to use her accounts.

{¶161} Video surveillance introduced by the State shows Tarra Wright and Pamela Webb selecting items and making purchases at CVS with Ms. Maze's credit cards.

*Counts 14 and 15 Yvonne Moyer*

{¶162} Yvonne Moyer testified on August 28, 2010, she was eating at P.F. Chang's restaurant with her daughter at Easton Town Center. Tr. at 281. She sat in the bar area at the high-top tables.  When she went to pay her bill, she noticed her wallet was missing. Tr. at 282.   She called her husband, who contacted her bank, confirming charges had been placed on her credit cards. Tr. at 283-284.  She discovered her cards had been used at Best Buy, CVS, Macys, Bed, Bath and Beyond, and several other stores. Tr. at 285. She testified she is the only person with permission to use her cards.

{¶163}  Trial testimony established Webb used Moyer's credit card at Best Buy, along with a Texas driver's license, to purchase a new computer.  Dante Collier, a Best Buy employee, testified he followed her outside and observed her get into a large van with non-Ohio plates.

*Counts 16, 17, 18 and 19 Michell Greiwe*

{¶164}  The State did not procure Ms. Greiwe's attendance at trial.  However, James Kasbek, an assistant manager/asset protection for Target at the Polaris location, testified on August 30, 2010, he became involved in an investigation of a female inside his store.  Tr. at 337. He testified he was interested in the person as she was a person of interest in a potential credit card fraud the week prior. Tr. at 338.  He followed the female as she walked throughout the store via cameras placed throughout the store. Tr.at 340. The female made several purchases throughout the store with different credit

cards. The cards were in the name of Michelle Greiwe as cardholder. Tr. at 348. Kasbek testified to video evidence of the female leaving the store and entering the passenger side of a van. Tr. at 351. Pamela Webb was later identified as the female on the store surveillance. Further, pieces of an operator's license with the name "Michelle Greiwe" and Michelle Greiwe's stolen checkbook were found inside Appellant's van upon his arrest.

{¶165} Detective Rickenbacher of the Dublin Police Department testified Michelle Greiwe filed a police report indicating her credit cards had been stolen. Pamela Webb testified she was not Michelle Greiwe, nor was she authorized to use her credit cards.

*Counts 26, 27, 28, 29 and 31 Brooke Bachus*

{¶166} Brooke Bachus testified on October 26, 2010 she had lunch at Panera Bread in Delaware County. Tr. at 566. She placed her purse on the back of her chair. She testified she never gave anyone permission to use her credit cards. Tr. at 569.

{¶167} When she left Panera, she received a telephone call from her credit card company informing her there was an issue with her account. Tr. at 570. She learned of a big purchase on her PNC credit card at Best Buy, a cash withdrawal at Chase and a purchase at Macy's.

{¶168} In video surveillance video obtained from the Macy's store, Appellant is observed selecting merchandise with the codefendants. They check out together, and pay with Bachus' stolen credit card. They exit the store, and are followed by Columbus Police, leading to their arrest.

*Analysis*

{¶169} Upon review of the testimony of Pamela Webb and the various victims and other testimony and evidence set forth above, we find the record demonstrates Appellant engaged in a pattern of corrupt activity and the individual charges set forth above with Pamela Webb and his girlfriend, Tarra Wright. The trier of fact is in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.

{¶170} The evidence demonstrates Appellant, Webb and Wright made plans to travel to various shopping areas, enter restaurants, steal wallets from purses located near the back of chairs while the victim of the theft ate at the restaurant. Appellant would manufacture a fake driver identification card, and Webb and Wright, sometimes Appellant, would use the identification and the stolen card to make purchases and obtain cash advances on the stolen credit cards. The evidence demonstrates Appellant aided and abetted Webb and Wright in the utilization of the stolen credit cards and all three received stolen property as a result of the transactions.

{¶171} We find the evidence is sufficient to support each count for which Appellant was convicted, and Appellant's convictions are not against the manifest weight of the evidence.

*Theft and Possession of Criminal Tools*

{¶172} Based upon the testimony and evidence set forth above, we find Appellant's convictions for theft and possession of criminal tools supported by the manifest weight and sufficiency of the evidence.

{¶173} Appellant's convictions in the Delaware County Court of Common Pleas are affirmed.

By: Hoffman, P.J.

Wise, J.  and

Baldwin, J. concur